## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 12 2019, 8:53 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Steven J. Halbert
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Katherine A. Cornelius
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of Ra.S., Roy.S., and Rod.S. (Minor Children), Children in Need of Services, and<br><br>R.S. (Mother),<br><br>*Appellant-Respondent,*<br><br>v.<br><br>Indiana Department of Child Services,<br><br>*Appellee-Petitioner* | August 12, 2019<br><br>Court of Appeals Case No. 19A-JC-396<br><br>Appeal from the Marion Superior Court<br><br>The Honorable Mark A. Jones, Judge<br><br>The Honorable Rosanne Ang, Magistrate<br><br>Trial Court Cause Nos. 49D15-1812-JC-2924, -2925, -2926 |

**Crone, Judge.**

# Case Summary

[1] Following factfinding and dispositional hearings, R.S. ("Mother") argues that the trial court erred in determining that her three minor children are children in need of services ("CHINS"), that her counsel at the factfinding hearing was ineffective, that the court erred in not immediately placing her children with her cousin; and that the court erred in ordering her to participate in allegedly unnecessary services. We conclude that the trial court abused its discretion in ordering Mother to submit to random drug screens and therefore reverse and remand with instructions to amend the participation order accordingly, but we affirm the trial court in all other respects.

# Facts and Procedural History

[2] Mother has three minor children: daughter Ra.S., born in May 2010, daughter Roy.S., born in July 2012, and son Rod.S., born in November 2014 (collectively "the Children"). The Children have different fathers. In July 2018, Mother and the Children resided in Marion County. Shortly after midnight on July 19, police officers responded to a report of "[t]wo females fighting in [a Jasper County gas station] parking lot and one might have been possibly intoxicated with children in the car." Tr. Vol. 2 at 9. Newton County Sheriff's Department Deputy Ryan Holloway was the first to arrive and saw the car driving away. He stopped the car, which was being driven by Mother. An eighteen-year-old female passenger was in the front seat, and the Children were in the back seat. According to Deputy Holloway, Mother "seemed kind of shaken up, she was kind of slurring her words a little bit, she smelled like [the] odor of alcohol." *Id*.

at 7. "She pretty much said the fight wasn't really a fight. It was just two people arguing; however, there was like scratch marks all over her chest and on her neck." *Id*. Jasper County Sheriff's Department Deputy Michael Wallace arrived and asked Mother if she had been drinking. Mother admitted that she had but "thought she would be under the legal limit." *Id*. at 10. Deputy Wallace administered three field sobriety tests, which Mother failed, as well as a portable breath test, which indicated a blood alcohol level of .105. Mother consented to a chemical test, which was administered at a police station and indicated a blood alcohol level of .085. At that point, Mother was arrested for operating while intoxicated.

[3] Indiana Department of Child Services ("DCS") assessment family case manager Erin Smith received a report about Mother "driving intoxicated with children in the car" and arrived at the gas station "about 12:30 in the morning." *Id*. at 12. Mother had already been taken to the police station. "[T]he children were trying to sleep because it was late and it was about … 56, 57 degrees outside." *Id*. at 13. "The children were in bathing suits. They didn't have any clothing available to them." *Id*. According to Smith, the children "were cold and they were tired and they were hungry. They reported that all they ate that day was corn." *Id*. The Children were placed in foster care in Jasper County.

[4] Smith met Mother at the jail "probably about 9:30 in the morning." *Id*. at 14. Smith tried to get Mother "to sign the consent to talk to the children and she refused to sign anything. She refused to even take any of [Smith's] paperwork with her." *Id*. Mother's passenger had told Smith that "they had left about five

or six at night to go to the beach[,]" and Mother explained that "they lived in Georgia and the children miss the beach and so she wanted to take her kids to the beach." *Id.* Smith "asked about potential other placements [for the Children], like if [Mother] had any relatives or friends or neighbors. [Mother] refused to give [Smith] anybody. She was just very adamant that there was nobody besides an uncle in the military." *Id.*[1] That same day, DCS filed petitions in Jasper Circuit Court alleging that the Children were CHINS pursuant to Indiana Code Section 31-34-1-1.

[5] A factfinding hearing was set for August 20. On that date, Mother contacted the trial court and stated that her car had broken down and she would be unable to attend the hearing. The court reset the hearing for August 31. On August 21, Mother's counsel filed a motion to continue the hearing. On August 23, the court issued an order resetting the hearing for September 14. On August 27, Mother's counsel filed a motion to reset the hearing for September 12. On August 29, the court issued an order resetting the hearing for September 12 at 1:00 p.m. Mother failed to appear at the appointed time. The trial court asked her counsel if he knew of her whereabouts. Counsel replied,

> Yes, your honor. She called my office and stated that her hearing was September 14th, I disagreed. I sent her a letter on August 27th telling her it was today at one. One of my employees on that same day called her telling her it was on the 12th. I

---

[1] DCS investigated the possibility of placing the Children with their maternal grandmother, but "she had some substantiations of child abuse and neglect" and therefore did not "qualify" as a suitable relative placement. Tr. Vol. 2 at 13.

personally spoke to her and told her that it was on the 12th, so she's not here.  She said she will not make it today.

*Id*. at 4.  Counsel did not request a continuance, and the trial court proceeded with the hearing.  DCS presented testimony from Holloway, Wallace, and Smith, who testified about wellness checks and forensic interviews conducted with the Children.  Mother's counsel presented no evidence.

[6]     On September 14, the trial court issued separate orders as to each of the Children that contain the following common factual findings:

> 1.  That on or about July 19, 2018, mother and an eighteen year old passenger engaged in an argument at [a] gas station which prompted bystanders to call the police.
>
> 2.  That upon arrival of law enforcement mother appeared in a state of intoxication which led police to test her alcohol level. Mother was taken to Demotte Police Department for a rapid toxicity test in which she blew a .085.
>
> 3.  That the child was in the vehicle while mother was driving intoxicated.
>
> 4.  That mother was arrested and booked into the Jasper County Jail for operating while intoxicated.
>
> 5.  That DCS went to the jail on July 19, 2018, to speak with mother at that time mother was confrontational and refused to sign any paperwork or submit to an oral drug screen.
>
> 6.  That when the children were detained on July 19, 2018, the children were found to be only in bathing suits and it was around

57 degrees outside.  The children were extremely[2] hungry claiming they only had corn to eat that day.

7.  That when the children were bathed the next morning by foster mother they were clueless on how to bathe themselves properly and were very dirty leaving a dirt ring in the bathtub and dirt collected on the bottom of the bathtub.

Appellant's App. Vol. 2 at 125, 127, 129.

As to Ra.S., the court found:

8.  That the child was found to have mold in her hair when the braids were unraveled.

9.  That the child is underweight and struggles with reading.

10.  That the child was behind on immunizations.

11.  That a forensic interview on or about July 30, 2018, was conducted with the child wherein the child reported that her grandfather [E.F.], with whom she lives, touched her privates.

*Id*. at 126.

As to Rod.S., the court found:

8.  That the child is very underweight.

9.  That the child was taken to the hospital for a follow-up appointment for blood work and an x-ray as the doctor was

_____

2 Mother criticizes the trial court's use of this term, noting that Smith did not describe the Children as "extremely" hungry in her testimony.  Any error in this regard is negligible.

concerned with how bloated he was. That the child has a concerning heart murmur and a referral for a pediatric cardiologist was created for Riley Children's Hospital.

10. That the child has had no immunizations.

11. That a forensic interview on or about July 30, 2018, was conducted with the child wherein the child reported that [his] grandfather [E.F.], with whom [he] lives, touched [his] privates.

*Id*. at 128.

And as to Roy.S., the court found:

8. That when the child's extensions were taken out of her hair it was very dirty and dirt collected in the bottom of the bathtub when her hair was washed.

9. That the child is underweight and still requires to be in a car seat, not a booster seat, and is wearing 3T clothing.[3]

10. That the child was behind on immunizations.

11. That the child had a bacterial infection and is urinating frequently, she reported having to sit in urine soaked clothing and re-wear urine soaked clothing.

12. That a forensic interview on or about July 30, 2018, was

---

[3] DCS cites non-authoritative online sources regarding average child weights and clothing sizes in an attempt to establish how underweight Roy.S. was. *See* Appellee's Br. at 8 (citing www.livestrong.com and www.happylittlehomemaker.com). We reject the implicit invitation to take judicial notice of this information. *Cf.* Ind. Evidence Rule 201(a) (providing that a court may judicially notice a fact that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.").

conducted with the child wherein the child reported that her grandfather [E.F.], with whom she lives, touched her privates.

*Id*. at 130.

[10] And finally, with respect to all three Children, the trial court found that Mother "has been uncooperative throughout the case including not providing DCS with information for relative placement or any information in regards to the father" and that "the child needs care, treatment, or rehabilitation that the child is not receiving, and its [sic] unlikely to be provided or accepted without the coercive intervention of the court." *Id*. at 126, 128, 130. The court determined that the Children are CHINS pursuant to Indiana Code Sections 31-34-1-1 and 31-34-1-3 and transferred all three cases to Marion Superior Court "due to the fact that mother resides in Marion County." *Id*.

[11] On January 23, 2019, a dispositional hearing was held in Marion Superior Court. Mother appeared in person and by different counsel. On January 24, the court issued a dispositional decree that reads in pertinent part as follows:

> DCS reports that background checks were completed for [Mother's cousin, who lives in Marion County,] and there were no concerns; however, the DCS would like to receive a positive recommendation from the children's therapist.
>
> GAL [guardian ad litem] reports that she has an appointment scheduled to see the children tomorrow. GAL has no objection with the authorization for relative care.
>
> ….

> The Court orders the DCS to speak with the children's therapist within one week. The Court orders the GAL to speak to the children and their therapist within one week. If there are no concerns, the Court orders placement of the children in relative care with [Mother's cousin].

*Id*. at 181. The court also issued a parental participation order requiring Mother to participate in home-based therapy, home-based case management, a parenting assessment, and a substance abuse assessment, to follow all recommendations, and to submit to random drug and alcohol screens. The order states that "[a]ny request for drug screen that is not completed in a timely manner will result in a positive result indication." *Id*. at 183-84. This appeal followed. Additional facts will be provided as necessary.

## Discussion and Decision

Mother contends that the trial court erred in determining that the Children are CHINS, that her counsel at the factfinding hearing was ineffective, that the court erred in not immediately placing the Children with her cousin, and that the court erred in ordering her to participate in allegedly unnecessary services.

## Section 1 – The trial court's CHINS determination is not clearly erroneous.

Pursuant to Indiana Code Section 31-34-1-1, a child under eighteen years of age is a CHINS if:

> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the

child with necessary food, clothing, shelter, medical care, education, or supervision:

> (A) when the parent, guardian, or custodian is financially able to do so; or
>
> (B) due to the failure, refusal, or inability of the parent, guardian, or custodian to seek financial or other reasonable means to do so; and

(2) the child needs care, treatment, or rehabilitation that:

> (A) the child is not receiving; and
>
> (B) is unlikely to be provided or accepted without the coercive intervention of the court.

"DCS bears the burden of proving by a preponderance of the evidence that a child is a CHINS." *Matter of E.K.*, 83 N.E.3d 1256, 1260 (Ind. Ct. App. 2017), *trans. denied* (2018).[4]

---

[4] As stated above, the trial court also determined that the Children are CHINS pursuant to Indiana Code Section 31-34-1-3, which pertains to children who are victims of certain offenses or who live in the same household with victims or perpetrators of certain offenses. Because we affirm the trial court's CHINS determination under Section 31-34-1-1, we do not address Mother's challenges to findings that relate to Section 31-34-1-3. We do, however, address Mother's complaint that the trial court asked DCS's counsel to "[m]ake specific findings in [her proposed] order" about Mother's "failure to cooperate on the sex allegations" and her assertion that no evidence was presented about this at the factfinding hearing. Appellant's Br. at 10 (quoting Tr. Vol. 2 at 19). At the hearing, Smith testified that Ra.S. "gave [a] very deep, detailed account of how she was touched and also said that she told her mom and her mom said, well, he did it to me too and that we just don't be alone with [E.F.]" Tr. Vol. 2 at 16-17. This testimony indicates that Mother failed to fulfill her statutory duty to report suspected child abuse to DCS or the local law enforcement agency, Ind. Code ch. 31-33-5, which is certainly akin to failing to cooperate with those agencies. In any event, as Mother acknowledges, DCS's counsel did not include such a finding in her proposed order.

[14] "A CHINS determination is based on the best interests of the child, not the guilt or innocence of either parent." *Id*. at 1261 (quotation marks omitted). "The purposes of a CHINS case are to help families in crisis and to protect children, not punish parents." *Id*. (quoting *Matter of D.P.*, 72 N.E.3d 976, 980 (Ind. Ct. App. 2017)). "However, the government is permitted to forcibly intervene in a family's life only if the family cannot meet a child's needs without coercion— not merely if the family has difficulty meeting the child's needs." *Id*. "In order for a child to be a CHINS, DCS must prove not only that one or the other of the parents suffers from shortcomings, but also that the parents are unlikely to meet a child's needs absent coercive court intervention." *Id*. "[E]vidence that a child is endangered is not by itself enough to warrant a CHINS finding and the State's parens patriae intrusion into family life. On the other hand, a court need not wait until a tragedy occurs before entering a CHINS finding." *D.P.*, 72 N.E.3d at 980 (citation omitted).

[15] "[A]s a general rule appellate courts grant latitude and deference to trial courts in family law matters." *Id*. "This deference recognizes a trial court's unique ability to see the witnesses, observe their demeanor, and scrutinize their testimony, as opposed to this court's only being able to review a cold transcript of the record." *Id*. "When we review a trial court's CHINS determination, we do not reweigh the evidence, we do not judge witness credibility, and we only consider the evidence and reasonable inferences which support the trial court's determination." *B.T. v. Ind. Dep't of Child Servs.*, 121 N.E.3d 665, 668 (Ind. Ct. App. 2019).

[16] The trial court entered sua sponte findings and conclusions supporting its CHINS finding, although they are not statutorily required. *D.P.*, 72 N.E.3d at 979. "As to the issues covered by the findings, we apply the two-tiered standard of whether the evidence supports the findings, and whether the findings support the judgment." *Id.* (quoting *In re S.D.*, 2 N.E.3d 1283, 1287 (Ind. 2014)). "We review any remaining issues not covered by the findings under the general judgment standard, meaning we will affirm a judgment if it can be sustained on any legal theory supported by the evidence." *Id.* at 979-80. "We reverse a CHINS determination only if it was clearly erroneous. A decision is clearly erroneous if the record facts do not support the findings or if it applies the wrong legal standard to properly found facts." *Matter of A.R.*, 110 N.E.3d 387, 400 (Ind. Ct. App. 2018) (citation omitted). Where findings on one legal theory are adequate, findings on another theory amount to mere surplusage and cannot be a basis for reversal even if erroneous. *Matter of G.M.*, 71 N.E.3d 898, 908 (Ind. Ct. App. 2017).

[17] Mother first challenges finding 5, asserting that Smith "did not testify that she asked Mother to do an oral drug screen or that Mother refused to submit to one." Appellant's Br. at 9. Mother is correct. She also challenges finding 7 about the Children's dirtiness and inability to bathe themselves; she contends that "[t]he children were returning home from the beach so it is little wonder that they were dirty and left a dirt ring on the bathtub." Appellant's Br. at 15. This is simply an invitation to reweigh evidence in her favor, which we may not do. Mother challenges finding 11 as to Roy.S., asserting that "there was

nothing at the hearing which could remotely be construed to support this finding" regarding a bacterial infection and urine-soaked clothing. *Id*. at 9. Again, Mother is correct. Finally, Mother challenges the trial court's finding that she was uncooperative, asserting that no evidence was presented that she "refused to provide" the names of the Children's fathers. *Id*. at 10. Although no evidence was presented on this particular point, Smith testified that Mother was "confrontational, argumentative[,]" and uncooperative in other respects, as stated above. Tr. Vol. 2 at 17.

[18] Notwithstanding the errors described by Mother, the unchallenged findings establish that she seriously impaired or seriously endangered the Children's physical or mental condition by operating a vehicle while intoxicated when they were in the back seat and by neglecting their physical health and hygiene. Mother claims that she "made a one-time mistake and is subject to the jurisdiction of the Jasper County criminal court system as a result of that mistake." Appellant's Br. at 15. The Children's weight, immunization, and hygiene issues indicate that Mother had been neglecting their basic needs for an extended period of time. Based on Mother's uncooperativeness with DCS, it was reasonable for the trial court to conclude that the care, treatment, or rehabilitation needed by the Children was unlikely to be provided or accepted without coercive court intervention. Accordingly, we cannot conclude that the court clearly erred in determining that the Children are CHINS pursuant to Indiana Code Section 31-34-1-1.

# Section 2 – Mother has not established that her counsel at the factfinding hearing was ineffective.

Mother also contends that her counsel at the factfinding hearing was ineffective, resulting in the denial of due process. Our supreme court has not formulated an ineffectiveness standard specifically for CHINS proceedings, but with respect to termination of parental rights proceedings, where the due process stakes are considerably higher given the potentially imminent and permanent severance of the parent-child relationship, the court has stated,

> Where parents whose rights were terminated upon trial claim on appeal that their lawyer underperformed, we deem the focus of the inquiry to be whether it appears that the parents received a fundamentally fair trial whose facts demonstrate an accurate determination. The question is not whether the lawyer might have objected to this or that, but whether the lawyer's overall performance was so defective that the appellate court cannot say with confidence that the conditions leading to the removal of the children from parental care are unlikely to be remedied and that termination is in the child's best interest.

*Baker v. Marion Cty. Office of Family & Children*, 810 N.E.2d 1035, 1041 (Ind. 2004); *see also* Ind. Code § 31-35-2-4(b)(2) (allegations of petition to terminate parental rights). Tailoring this analysis to Indiana Code Section 31-34-1-1, and bearing in mind the less onerous burden of proof in CHINS proceedings,[5] the

---

[5] DCS "is required to prove that termination is appropriate by a showing of clear and convincing evidence." *In re V.A.*, 51 N.E.3d 1140, 1144 (Ind. 2016). "This is a higher burden than establishing a mere preponderance[,]" *id.*, which is the burden in CHINS proceedings.

question here is whether counsel's overall performance was so defective that we cannot say with confidence that the Children's physical or mental condition is seriously impaired or seriously endangered as a result of certain parental shortcomings and that the Children need care, treatment, or rehabilitation that is unlikely to be provided or accepted without coercive court intervention.

[20] Mother criticizes counsel for not requesting a continuance when she failed to appear at the hearing, as well as for calling no witnesses, introducing no exhibits, conducting "perfunctory" cross-examinations of DCS's witnesses, and agreeing with Smith's statement that she "was confrontational and argumentative." Appellant's Br. at 11. The record establishes that Mother was informed of the hearing date; she has offered no valid justification for her failure to appear and has demonstrated no prejudice resulting from counsel's failure to request a continuance. Likewise, she has failed to propose which witnesses should have been called, which exhibits should have been introduced, and which questions should have been asked on cross-examination. Counsel's agreement with Smith's remark may have been unprofessional and ill-advised, but it did not deprive Mother of a fundamentally fair hearing. *See Purcell v. Old Nat'l Bank*, 972 N.E.2d 835, 841 n.4 (Ind. 2012) (noting that trial judges are "able to separate the wheat from the chaff, ignoring the extraneous, the incompetent and the irrelevant") (quoting *King v. State*, 155 Ind. App. 361, 367, 292 N.E.2d 843, 847 (1973)).

Mother also contends that counsel should have objected to allegedly inadmissible hearsay statements uttered by Smith regarding the Children's physical health and hygiene.[6] DCS points out that

> the record is devoid of information about why trial counsel did not object to the admission of hearsay evidence or whether those with direct evidence were available to testify. By failing to challenge the effectiveness of counsel at disposition or through a motion under Trial Rule 60 or some other means, there is no record for whether or not these were strategic decisions or because of prior agreements between the parties.

Appellee's Br. at 22-23. DCS further observes that Deputies Holloway and Wallace had firsthand knowledge that Mother drove while intoxicated with the Children in the car, and that Smith "saw for herself the underweight status of the Children, the bathing, the hair problems, and the size of [Roy.S.'s] clothes[.]" *Id*. at 23.[7] Smith also saw for herself that Mother was uncooperative and would be unlikely to provide or accept the care, treatment, or rehabilitation that the Children needed without coercive court intervention. Based on the foregoing, we find no merit in Mother's ineffectiveness claim.

---

[6] Mother makes the same argument about the hearsay statements regarding the alleged sexual abuse. Because we may affirm the trial court's CHINS determination without considering those statements, we need not address this argument.

[7] Smith testified that she took photos of the "dirt in the bathtub[,]" Tr. Vol. 2 at 16. which suggests that she was present at or about the time the Children were bathed and their hair was washed.

# Section 3 – The trial court's handling of the Children's placement is not clearly erroneous.

[22] Indiana Code Section 31-34-19-6 provides in pertinent part,

> If consistent with the safety of the community and the best interest of the child, the juvenile court shall enter a dispositional decree that:
>
> (1) is:
>
>> (A) in the least restrictive (most family like) and most appropriate setting available; and
>>
>> (B) close to the parents' home, consistent with the best interest and special needs of the child;
>
> (2) least interferes with family autonomy;
>
> (3) is least disruptive of family life;
>
> (4) imposes the least restraint on the freedom of the child and the child's parent, guardian, or custodian; [and]
>
> (5) provides a reasonable opportunity for participation by the child's parent, guardian, or custodian[.]

[23] Mother asserts that the trial court should have immediately placed the Children with her cousin in Marion County. The Children's placement has been in an unfortunate state of flux since the court issued its dispositional decree, which is the order from which Mother has appealed. Consequently, the issue is essentially moot. That said, we agree with DCS that "[i]t is not unreasonable

for the judge to request the opinions of professionals working with the Children, service providers, the [family case manager] and the GAL[,]" Appellee's Br. at 26, and thus we cannot conclude that the trial court's handling of the Children's placement was clearly erroneous.[8]

## Section 4 – The trial court abused its discretion in ordering Mother to submit to random drug screens.

[24] Finally, we address Mother's challenge to the trial court's participation order. A trial court has broad discretion in determining what programs or services a parent is required to participate in, but the requirements must relate to some behavior or circumstances that were revealed by the evidence. *In re K.D.*, 962 N.E.2d 1249, 1258 (Ind. 2012). Mother contends that "[d]rug assessment, random drug testing and substance abuse treatment were not properly included in the parental participation decree where there was no evidence of a substance

---

[8] On February 4, DCS filed a motion for modification of disposition, which states that the Children had been removed from their foster home in Jasper County because the foster parent had stated that "no children in her home were safe at that time." Appellant's App. Vol. 2 at 191. The motion also states, "DCS and the GAL did speak with the children's therapist, who is a licensed clinical social worker, as ordered by this Court. Based on that conversation, neither GAL nor DCS recommend placement with the proposed relative, [Mother's cousin]." *Id.* Also on that date, DCS filed a modification report for placement, which states, "While at the school visiting with [Ra.S. and Roy.S.], GAL and Clinical Social Worker asked [Ra.S.] about [Mother's cousin]. GAL and Clinical Social Worker reported [Ra.S.] showed fear of the relative's name. At that time GAL was not comfortable with placing the children with [Mother's cousin]." *Id.* at 195. The report recommends that the Children "be placed in Foster Care in Marion County to ensure their safety and to allow them to have visits with [Mother]. The permanency plan is reunification." *Id.* at 196. Mother filed an objection to DCS's motion for change of placement. On February 8, the trial court issued an order authorizing the Children to be placed in foster care in Marion County, ordering DCS "to provide mother with additional information as to the concerns regarding the proposed relative" within one week, and setting a placement review hearing for May 1. *Id.* at 202. To the extent Mother suggests that the trial court erred in refusing to place the Children with her cousin without holding an evidentiary hearing on DCS's concerns, we note that the May 1 hearing may have served this purpose.

abuse history." Appellant's Br. at 18. She notes that her counsel "strenuously objected to Mother being subjected to random drug screens because of the burden they [create] for a parent who does not have reliable transportation" and that she "had offered to use a RADAR monitor to address any concerns about drinking." *Id.*[9]

[25] At the dispositional hearing, DCS's counsel noted that Mother had "just served a sentence" in "her criminal case" and "wasn't ordered to do any kind of treatment." Tr. Vol. 2 at 24. DCS's counsel stated that DCS "would be willing to provide a bus pass to assist mother in getting to any screens." Tr. Vol. 2 at 24. The trial court gave the following rationale for ordering Mother to participate in the foregoing services:

> [T]here are a few different reasons why I'm not ordering specifically, the RADAR, [Mother] it does seem like there's quite a few things that you got up in the air right and DCS can help you with the transportation piece, but what I'll say is that I have a lot of parents who when they find out that they're being tested for one substance the specific substance that caused the case to be filed they start switching. Particularly, so I've got people who start drinking because they can't use cocaine, I have parents who just turn to different and that doesn't help me and it certainly doesn't help you. If your goal is to get your kids back into your I need to make sure that you're – you've obtained sobriety, that you're maintaining sobriety and to be honest there are a lot of issues that form the basis for people turning to illicit substances

---

[9] The record indicates that a RADAR monitor allows for remote monitoring of alcohol consumption. *See* Tr. Vol. 2 at 22 (Mother's counsel "requesting that [Mother] be able to be put on a RADAR monitor, something that would not require her to [...] be traveling to a clinic and keeping up with that.").

or alcohol use, and so that's why I'm ordering the substance abuse. I would like more information as to how we got to this point and how to address it because until we do that I can't return your children to your care and so all of that – and if what you're saying is, "Yes, I've already gotten there", then that evaluation is going to help me figure that out and if in fact that you haven't that evaluation is going to help me figure that out. So all of those things need to be done. DCS if you do find that there are no concerns as the case goes on and you think RADAR is more appropriate or you think that the screens can be adjusted then so be it and that's something you can file a motion with the Court and if there is – especially if you feel that RADAR is the best thing file a motion and we can – I'll take a look at that, but right out of the gate I'm not willing to do that particularly given why we're here and the kids' direct involvement as to why we're here.

*Id*. at 25-26.

[26]     Given Mother's conviction for operating while intoxicated, which led to the initiation of this CHINS proceeding, we find no abuse of discretion in the trial court ordering Mother to complete a substance abuse assessment to determine whether she currently abuses or is at risk of abusing alcohol or drugs. And we would find no abuse of discretion in ordering Mother to use a RADAR monitor, as counsel for both Mother and DCS suggested, to keep tabs on her alcohol consumption while she is under court supervision.[10] But absent any evidence that Mother has a history of using illegal drugs, we conclude that the

---

[10] At the dispositional hearing, DCS's counsel "agree[d]" with Mother's counsel that "the RADAR monitor [may be] more appropriate for this situation." Tr. Vol. 2 at 23.

trial court abused its discretion in ordering her to submit to random drug screens. Even with transportation assistance from DCS, random drug screens impose significant burdens on a parent; such burdens should not be imposed based on mere speculation that the parent is abusing and may "start switching" substances.[11] Consequently, we reverse the trial court's participation order and remand with instructions to vacate the random drug screen requirement unless evidence has been presented in subsequent hearings that would support imposing such a requirement.

[27] Affirmed in part and reversed and remanded in part.

Bradford, J., concurs.

Tavitas, J., concurs in part and dissents in part.

---

[11] Mother points out that "alcohol consumption is legal and the use of illicit drugs is not." Appellant's Br. at 17.

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of Ra.S., Roy.S., and Rod.S. (Minor Children), Children in Need of Services, and<br><br>R.S. (Mother),<br>*Appellant-Respondent,*<br><br>v.<br><br>Indiana Department of Child Services,<br>*Appellee-Petitioner.* | August 12, 2019<br><br>Court of Appeals Case No. 19A-JC-396<br><br>Appeal from the Marion Superior Court<br><br>The Honorable Mark A. Jones, Judge<br><br>The Honorable Rosanne Ang, Magistrate<br><br>Trial Court Cause Nos. 49D15-1812-JC-2924, -2925, -2926 |

**Tavitas, Judge, concur in part and dissent in part.**

[28] I respectfully concur in part and dissent in part. I agree with the majority that the trial court properly found the Children are CHINS, that Mother has failed to establish that her counsel was ineffective, and that the trial court's handling of the Children's placement is not clearly erroneous. I disagree, however, that the trial court abused its discretion by ordering Mother to submit to "random

drug/alcohol screens." Appellant's App. Vol. II p. 183. I would affirm the trial court's order in all respects.

[29] Our Supreme Court has held that, "[a]lthough the juvenile court has broad discretion in determining what programs and services in which a parent is required to participate, the requirements must relate to some behavior or circumstances that was revealed by the evidence." *In re K.D.*, 962 N.E.2d 1249, 1258 (Ind. 2012) (quoting *A.C. v. Marion County Dep't of Child Servs.*, 905 N.E.2d 456, 464 (Ind. Ct. App. 2009)). "[F]orcing unnecessary requirements upon parents whose children have been adjudicated as CHINS could set them up for failure with the end result being not only a failure to achieve the goal of reunification, but potentially, the termination of parental rights." *K.D.*, 962 N.E.2d at 1258 (quoting *A.C.*, 905 N.E.2d at 464-65). We reversed in *A.C.* because there was absolutely no evidence that the mother had a substance abuse issue, but the trial court ordered a complete drug and alcohol assessment.

[30] Here, Mother argues there is no evidence of a substance abuse history, but DCS presented evidence of an alcohol issue given Mother's conviction for operating while intoxicated with the Children in the vehicle. The trial court's order was related to circumstances revealed by the evidence. Although perhaps some trial courts would have ordered the proposed RADAR monitor rather than random drug/alcohol testing, I do not believe that the order for random drug/alcohol testing was an abuse of discretion. Under these circumstances, I would affirm the trial court's order. Consequently, I concur in part and dissent in part.